Fecteau, Francis R., J.
This is an action brought by the plaintiffs against their former employer, pursuant to the provisions of G.L.c. 149, §26-27, by which they allege violations of the prevailing wage law.[3] The plaintiffs contend that they are entitled to receive prevailing wages, including an amount equal to customary employer payments to health and pension benefits, for all of the time during which they drove the defendant’s trucks and making their assigned deliveries to various projects which they allege to be public works construction, including road construction, sewer installation, landfill capping and hazardous waste clean-up sites, for most of which they received only standard, nonunion wages, together with multiple damages and attorneys fees. The defendant contends that they are not entitled to receive such premiums under the governing statute, as their work in delivering materials and supplies to construction sites does not qualify under the statute, nor do some of the projects at which they picked up or delivered loads qualify as public *696 works construction projects for which prevailing wages would apply.
Trial was conducted on April 25-26, 2005, before me, sitting without jury, the parties having waived their rights thereto. Following the close of evidence, the parties were granted until June 16, 2005, within which to file proposed findings of fact (including itemization of claimed damages pursuant to their theory of damages) and rulings of law; the arguments of the parties were heard on June 20, 2005, and the matter was taken under advisement. Findings of fact follow.

FINDINGS OF FACT

1. The plaintiffs Barry Cox, Rick Favreau and Eric Tobieson were drivers of dump and/or tank trucks and employed by the defendant during the years 1996 to 1998. In addition to fuel oil delivery during the heating season, during the warmer months they were often called upon to make pick-up and delivery of bulk materials such as asphalt,[4] stone and sand used in the road construction business, various layers of materials used in the capping of landfills, and the removal, by truck, of waste materials, such as asphalt that had been ground off road surfaces, and contaminated soils from clean-up sites.
2. T.S. Truck Services, Inc., (“T.S.”) was at all relevant times an owner of a fleet of commercial tractor-trailer dump trucks and tankers. Among other sources of business, it received contracts from various sources to supply trucks and drivers for the delivery of bulk products, often consisting of sand, gravel, stone, asphalt and other materials, to various locations at which the materials were stockpiled and/or applied in road construction and other projects. In addition, its trucks and drivers were sometimes called upon to haul waste products. It appears from the evidence that Truck Services received a large amount of work from the Trimount and Holden Trap Rock companies, both processors and suppliers of bulk materials.
3. Generally, the plaintiffs were assigned to projects within the central Massachusetts area, although it was not uncommon for the defendant to assign one or more to areas in the greater Boston area, as well as to projects in the northeast and southeast of Massachusetts, such as for the landfills in Haverhill and Plain-ville.
4. The manner in which the defendant paid the plaintiffs appears to vaiy between being paid by the hour and by the load delivered. During the relevant time period, the plaintiffs were generally paid a standard hourly rate of $ 14.00 per hour. If paid by the load, it appears to be a function of a percentage of the cost of the load, measured by the ton. For most deliveries of asphalt, the drivers were paid by the hour.
5. There were assignments for which the plaintiffs were paid “prevailing wage” as that term is used in the governing statute, i.e., G.L.c. 149, §§26-27, in an amount equal to that called for in the relevant teamsters’ union contract, inclusive of payments to health, welfare and pension funds.[5] The plaintiffs contend, however, that they were assigned by the defendant to several other projects, both of similar and different type, for which they are entitled to be paid a “prevailing wage”.
6. The projects that the plaintiffs contend fall into this category include various road-building assignments, landfill capping projects, and hazardous waste or environmental clean-up sites, among others.
7. Drivers for the defendant, including the plaintiffs, when assigned to deliver materials to road-construction sites, iypically were tasked to deliver either asphalt, in base coat grade or finish grade, processed stone, sand or gravel. When delivering asphalt, upon arrival at the road construction site and a possible wait for its turn to off-load, the driver was required to back the truck up to a “Barber-Green” paving machine and gradually dump the asphalt into a large, open hopper of the paving machine; as the machine moved down the road, laying the new surface of asphalt, the dump truck was in physical contact with the paving machine for as long as it took for the asphalt to be completely emptied into the paver. Absent unusual circumstances, on average, the amount of time that the dump truck was and is actually on the construction site interfacing, i.e., in physical contact with, a spreader is between five (5) and fifteen (15) minutes. During this operation, the truck is actually pushed by the machine down the street while asphalt is unloading from the truck. The truck driver remains in the driver’s seat, at the controls, but is subject to direction from the paving machine operator such as in case where the course of the road varied and also in case the dump body would have to be lowered to avoid overhead obstacles. Such a paving operation also requires a steady supply of asphalt in order to keep the paving machine able to continue to lay the new asphalt surface, with full dump trucks often waiting in line, for varying lengths of time, for their turn at the paver.[6] Conversely, the plaintiffs were occasionally assigned to pick up waste asphalt that had been removed from a road surface in preparation for resurfacing. For this pick-up, the truck was required to be in close proximity, i.e., either be slightly ahead, along side or closely behind a grinder machine with the ground asphalt being thrown or transferred from the grinder to the truck bed by means of a covered conveyer belt.
8. According to the evidence, Eric Tobieson was assigned to make a pick-up or delivery of bituminous concrete (asphalt) on 52 separate dates, Barry Cox hauled bituminous concrete on 9 separate dates and Rick Favreau made bituminous concrete delivery or pick-up on 29 dates. Although none of the plaintiffs were able to specific how many separate trips each made, nor how long each took if the time wasn’t specifically noted in their drivers’ logs, Joseph How *697 ard, the vice president and general manager of the defendant company at all relevant times has offered estimates, from his examination of time and work sheets submitted by each plaintiff based upon mileage and tonnage, in some cases, and hours logged in others. Upon examination of the daily trip logs executed by the plaintiffs, I find that Howard’s system for estimation and the resulting estimates of the number of loads to be credible. According to this system of estimation, Tobieson made 135 separate trips, Cox made 16 separate trips and Favreau made 57 separate trips, for which each claims a prevailing wage.[7] Of these 208 loads, 197 were carried for three suppliers: Trimount (60), Holden Trap Rock (107) and P.J. Keat-ing (30). Each of these deliveries were to a public road construction site.
9. Regarding the pick-up and/or deliveiy of materials other than asphalt, the driver was directed by the site contractor as to a location for the load to be dumped. Often for deliveries to sewer line construction work, and sometimes for deliveries to railroads, the driver typically was assigned to haul processed stone, of a particular specification, to a work site and dump the load at the direction of the general contractor in certain locations. Processed stone is neither gravel nor fill.
10. Soil which had been contaminated with oil and being excavated from various locations was another material that the plaintiffs were occasionally assigned to haul from one location to another. The plaintiffs claim to be entitled to prevailing wages apparently due to a perception that because a governmental environmental protection agency, whether state or federal, has either ordered a site to be cleaned, or it had been given a “DEP number,” it must, therefore, qualify as a public works construction project. The plaintiffs claim consists of 13 dates, involving 22 loads of material: Tobieson (7), Cox (1) and Favreau (14).[8] Among these loads were 2 pick-ups in Newport, R.I., 2 in New London, CT., and deliveries to Portland, ME. Of these 22 loads, 17 were delivered to the Trimount Plant in Shrewsbury, inferentially for processing into an “emulsion.” Contaminated soil is neither gravel nor fill.
11. Soil contaminated by oil was sometimes delivered to a processing plant for recycling into “emulsion” which had other uses in “construction.” Emulsion was the finished product after contaminated soil was processed by burning out the oil and by adding an asphalt product. This product had a use as a substrate in the capping of sanitary landfills, among other things, and the plaintiffs were frequently assigned to haul emulsion to landfill sites and to dump it according to the direction of the landfill operator, and they would sometimes have to await that direction. The emulsion was thereafter spread by a bulldozer. The Trimount plant in Shrewsbury, Massachusetts was the principal location of pick-up and the landfill in Plainville, Massachusetts, operated by a Laidlaw company under a lease with the town, was the usual destination. With such deliveries, Trimount was T.S.’s customer and from whom it would be paid. Truck Services was paid for emulsion deliveries by the ton and therefore, paid its drivers on a percentage basis per tonnage. The drivers did not keep a record of their time making emulsion deliveries. Emulsion was neither bituminous concrete, gravel nor fill.
12. Each plaintiff claims to have been assigned to haul emulsion to landfills for use in capping, primarily to the Plainville, Massachusetts landfill. Eric Tobieson made such deliveries on 18 separate dates between August 20, 1996, and December 17, 1997. Howard estimates that Tobieson made 50 distinct trips to the Plainville landfill. Likewise, Barry Cox delivered emulsion on 10 separate dates in 27 hips. Rick Favreau made emulsion deliveries on 2 dates, making 3 trips.[9]
13. Deliveries of sand, processed stone, gravel or fill constitute the remaining segment of hauls for which the plaintiffs claim prevailing wages. Tobieson’s claim includes 7 such deliveries on 4 dates, 2 for Trimount’s Ashland location and 2 for P.J. Keating, 3 by Cox on 2 dates, both to destinations described as railroad sites, and Favreau 23 separate trips on 8 dates, all on behalf of P.J. Keating, in Lunenburg to the site of the “Big Dig” in Boston.[10]
14. Whether a project was a “prevailing wage” job was generally known by the defendant in advance of the provision of services and equipment, as it would have been instructed by its contractor that it must submit “certified” time records for the employees provided to that job and there would usually be indications to the employer during the contracting stage of proceedings that higher rates were going to be paid. Other than to those contractors for which the defendant supplied trucks and drivers to projects known to be “prevailing wage” jobs, it did not ordinarily provide “certified” time records of its employees to its customers or contractors, nor were such requested on any of the jobs for which the plaintiffs make claim herein. The defendant had not been informed by any of its customers on the jobs for which the plaintiffs make claim that the contracting rate to be paid to the defendant included tasks or time under the prevailing wage law, nor that it should submit any certified time records for the work of its employees.
15. No evidence was offered by any plaintiff that in the process of delivering loads of sand, processed stone or emulsion to various sites including road construction sites and landfills, at which these materials were stockpiled, that they were involved in any significant construction activity other than by the delivery of these materials. Moreover, no evidence was offered by any plaintiff that, in the process of picking up and delivering loads of contaminated soil to any location, they were involved in any significant construction activity.

*698
DISCUSSION

The plaintiffs contend that they are entitled to recover prevailing wages for all the time they were involved, portal to portal, in the pick-up or delivery of bituminous concrete, whether new asphalt that was being applied to a road surface or old asphalt that was being ground from a road surface. In addition, they seek prevailing wages for all their time devoted to the delivery of processed stone and sand, primarily to sewer or other pipeline construction projects, and emulsion, for landfill capping purposes; moreover, they include the pick-up and delivery of contaminated soil in their claim, no matter the source, so long as it was required as a result of a government-ordered remediation of a hazardous waste site.
The plaintiffs base their claim upon G.L.c. 149, §26, which states, in relevant part:
In the employment of mechanics and apprentices, teamsters, chauffeurs and laborers in the construction of public works by the commonwealth, or by a county, town, authority or district, or by persons contracting or subcontracting for such works, preference shall first be given to citizens of the commonwealth . . . who are male veterans as defined . . . and who are qualified to perform the work to which the employment relates; and secondly, to citizens of the commonwealth . . . The rate per hour of the wages paid to said mechanics and apprentices, teamsters, chauffeurs and laborers in the construction of public works shall not be less than the rate or rates of wages to be determined by the commissioner as hereinafter provided;
and upon G.L.c. 149, §27, stating, inter alia, that:
[s]aid rates shall apply to all persons engaged in transporting gravel or fill to the site of said public works or removing gravel or fill from such site, regardless of whether such persons are employed by a contractor or subcontractor or are independent contractors or owner-operators.
Their claims can be generally grouped into two basic categories: asphalt deliveries or pick-ups at road construction sites, and the pick-up and/or delivery of other materials, including processed stone or sand deliveries at sewer or other pipeline or railroad construction sites, contaminated soil pick-ups and deliveries, and emulsion deliveries at landfill capping sites.

A. Asphalt

First, with respect to asphalt deliveries or pick-ups at road construction sites, the defendant concedes that the amount of time that each plaintiff behind the wheel of a dump truck and in physical contact with the Barber-Green paving machine off-loading the asphalt as the paver laid new surface, must be paid at prevailing wage, and contends that since no actual time records were kept for this specific activity, they should be paid on an average basis of 15 minutes per delivery. However, the defendant contends that the plaintiffs are not entitled, under the governing statute, to prevailing wage for any other time spent in hauling asphalt, including the time at the construction site while waiting to empty the asphalt into the paver, as the driver, during such times, is not actually engaged in construction activity, relying upon the case of Construction Industries of Massachusetts v. Commissioner of Labor and Industries, 406 Mass. 162 (1989).
In that case, the job of the bituminous concrete driver and his relationship with the plant and the site was described as follows:
Bituminous concrete is a mixture of sand and stone held together by a very heavy crude oil which acts as a glue. Bituminous concrete is often referred to as asphalt. It ranges from coarse to fine depending on the size of the stone used in its manufacture. Several layers of bituminous concrete are used in the construction of roads and highways. These range from a very coarse consistency in the lower levels to a fine layer on top. Sometimes an old road surface is ripped up, transported to the manufacturing plant, reprocessed, and then reapplied at the site. The manufacture of bituminous concrete takes place at either a stationary plant, from which it is then transported to the construction site or, in some cases, at portable on-site plants. In either case, the bituminous concrete is hauled by truck from the site of manufacture to the location where it is laid down. The role of the truck driver is the same whether the bituminous concrete is manufactured on the site or at a stationary plant. After loading the truck, the driver proceeds to the application site. The driver then backs the truck up to a device called a spreader and dumps the concrete into the spreader’s hopper. The spreader is used to lay the concrete down evenly. A “roller” follows the spreader and compacts the layer of bituminous concrete.
It usually takes several “lifts” to empty a truck. After dumping the first load into the spreader, the driver pulls the truck forward and waits for the spreader to empty out, Sometimes the spreader simply pushes the truck forward as it lays down the bituminous concrete. The truck driver continues to dump concrete into the spreader until his truck is empty. He then leaves the site, fills the truck again, returns to the site, and repeats the entire process. During the dumping and spreading procedure, the truck driver takes directions from the spreader operator and the foreman. It takes from five to fifteen minutes to complete the process and empty the truck.
At 163-64.
With respect to asphalt used in connection with road construction, old or new, the plaintiffs claim entitlement to prevailing wages, portal to portal, which obviously includes pure “over-the-road” time, off-site, and time spent waiting on-site for connection with the *699 paver. The defendant relies primarily on and finds some support in the above description of the tasks performed by the asphalt truck driver at the construction site and the average time for interaction between the asphalt truck and driver and the paving machine, together with the following additional language from Construction Industries of Massachusetts v. Commissioner of Labor and Industries, supra, the leading prevailing wage case relevant to the issues at bar:
Section 26 of the statute requires, however, that those teamsters be employed “in the construction of public works” and “on said works” (emphasis supplied). Section 27 makes reference to “jobs . . . on various types of public works upon which . . . teamsters . . . are employed” (emphasis supplied). Section 27B provides that employers “engaged in . . . public works” must maintain records of teamsters “employed thereon” (emphasis supplied). Quite clearly, the commissioner has not been given authority to set wages for all teamsters who have any connection with a public works project. The language of the statute limits his authority. The focus of that limitation is twofold. First, the statutory language makes repeated reference to the work site itself. This is the plain meaning of the language “on” and “upon” which appears in the statute. Second, the nature of the work performed on the site is an important aspect of the statute. This is evident from the use of phrases such as “in the construction” and “engaged in.” Thus, the limits of the commissioner’s authority to set wages under G.L.c. 149, §§26 and 27, are governed by the physical locus of the work site itself and the work which is performed there. The commissioner is empowered to set wages for teamsters when there is a significant nexus between the work those teamsters perform and the site of the construction project. In simple terms, the commissioner must ask, “What do they do at the site?” When the performance of a statutorily specified job has a significant connection with the construction project, then that job falls within the domain of the posted wage law statute. This is the plain meaning of the statute ...
At 168. In the defendant’s view, the court limited the application of the prevailing wage law to only the time on-site while tasks were being actually performed by the truck and driver while in physical contact with the paver. The defendant also relies upon a determination, after the fact, by the Office of the Commissioner of Labor and Industries in the case of In Re: Palmer Pauing of Palmer, M.A. et als., dated August 21, 2001, that prevailing wages were not payable for asphalt drivers “over-the-road” time, rescinding an earlier determination that it was. (See discussion of the “Dengenis Policy,” at 3.)
The plaintiffs’ position, however, finds support, not only in the “Dengenis Policy,” but also in the following language from the Construction Industries case, supra:
The bituminous concrete truck drivers are an integral part of the road construction process. Not only do they spend a great deal of time at the site, but they work with the road crew to spread the bituminous concrete. The truck drivers cooperate with the workers at the site in applying the concrete to the road surface. Their activities are an essential part of the work done at the site. In our view, the truck drivers are more than just “materialmen.”. . . The commissioner’s authority to set wage rates under G.L.c. 149, §§26 and 27, clearly encompasses the power to set wages for the teamsters employed by the plaintiffs who haul bituminous concrete to public works projects and then aid in its installation . . . [emphasis added).
At 169.
The relief ordered by the Supreme Judicial Court in that case was for a modification of the judgment to reflect a declaration affirming that “the commissioner has the authority, under G.L.c. 149, §§26-27F, to set wage rates for the drivers of trucks hauling bituminous concrete to public works projects and thereafter aiding in the installation of that concrete.” Construction Industries of Massachusetts, supra, at 173 [emphasis added.][11] Earlier in its discussion, the court had recognized a determination of the commissioner “[s]ince at least 1976,” within his responsibility to set rates paid to those employed on public works, to include “those truckers who haul bituminous concrete to the site of public works projects and aid in the application of that concrete, to be teamsters employed on those sites.” Id., at 165. In each such description of the work performed by the drivers, the court’s language is inclusive of both the “hauling” of asphalt to public works sites “and thereafter aiding in the installation.” While it is the fact that the truck drivers interact with and “aid” in the application of the asphalt in the road construction process at the project site that distinguishes them from the haulers of other materials, even the statutorily approved haulers of gravel and fill, the court’s discussion approving the authority of the commissioner to set prevailing wages for teamsters who deliver asphalt and assist in its installation does not suggest that a distinction was meant by the court to be drawn between their time spent in hauling the asphalt to the site from that of application of asphalt at the project site; rather, it is because there is a “significant nexus between the work the teamsters perform and the site of the construction project” which serves to qualify their job, which includes “hauling” time as well. “When the performance of a statutorily specified job [i.e., teamster] has a significant connection with the construction project, then that job falls within the domain of the posted wage law statute. This is the plain meaning of the statute.” Id., at 168. [underline added).
In the view of this court, an interpretation of the decision of the Supreme Judicial Court in Construction *700 Industries of Massachusetts, supra, which limits the application of the prevailing wage law to only that time, estimated to be between 5 and 15 minutes, when the asphalt truck is in actual physical contact with the paving machine as it spreads the asphalt being dumped into it is too narrow. Without words of limitation confining the authority of the commissioner to approve payment of prevailing wages solely for the “installation” activities conducted only at the construction site, the use of language inclusive of the “hauling” of asphalt implies an interpretation that “over-the-road” time “hauling bituminous concrete” may be considered as part of the “the employment of ... teamsters,... in the construction of public works” so long as the teamster “thereafter aid in the installation of that concrete.” Id., at 173.[12]
However, there is a portion of the plaintiffs’ claim for “over-the-road” time which receives little, if any, support from the Construction Industries of Massachusetts, supra namely, for the time spent once the delivery of new asphalt has been completed and when the truck is on its way either back to its point of origin or to some other destination and for the time spent while a truck is being driven, empty, to a road construction project to receive old asphalt being removed from the road surface by a grinder. While it is sufficiently clear from the language of the court inclusive of “hauling” activities, as part of the “job,” a view that it intended the application of the prevailing wage law “portal-to-portal” is too broad; the decision neither clearly expressed nor implied that the time spent while the truck is empty is intended to be covered by the prevailing wage law. Consequently, the court cannot agree with the plaintiffs that all of their time, “portal-to-portal” is subject to .the prevailing wage law.

B. Other Materials

With respect to all other aspects of the plaintiffs’ claims, the defendant asserts, and the court agrees, that the plaintiffs’ claims fail due to the fact that the projects to or from which the plaintiffs made delivery were either not public works construction sites, or, if they were, the plaintiffs were either not engaged in construction activities, or that the materials which the plaintiffs hauled have been excluded from the operation of the prevailing wage law.
First, with respect to the pick-up and/or delivery of contaminated soil, or its progeny, such as emulsion, the projects at which such soils were removed were not public construction, notwithstanding the orders of public enforcement agency(s) such as the Department of Environmental Protection. In several cases, the pick-up or delivery sites were not in Massachusetts, and in the cases of delivery in Massachusetts, they were to a private entity Trimount. Regarding the delivery of emulsion to municipal landfill capping operations, even aside from the question of whether the capping of a landfill constitutes public works construction, per se, or the question of whether the presence of a private intermediary, such as Laidlaw as a lessee operator, removes the landfill from the purview of public works, the plaintiffs were not engaged in construction activities, but rather were simply making pick-up and/or deliveries of materials.
Moreover, given the particular specificity that has been given to the hauling of gravel and fill to public construction sites by the legislature, all other material haulers are thereby excluded, with the exception of the application of asphalt, discussed above. This includes crushed or processed stone and sand. “It is true generally that ‘a statutory expression of one thing is an implied exclusion of other things omitted from the statute.’ Harborview Residents’ Comm., Inc. v. Quincy Hous. Auth., 368 Mass. 425, 432. Expressio unius est exclusio alterius. See 2A C. Sands, Sutherland Statutory Construction §47.23, at 194 (4th ed. 1984).” Construction Industries of Massachusetts, supra at 169. As with the delivery of emulsion, the plaintiffs’ activities involved with the hauling and delivery of sand and processed stone was simply making pick-up and/or deliveries of materials, even if such materials were later to be used in a public construction site, such as for sewer line or other pipeline construction. However, like the pick-up of contaminated soil and its delivery to Trimount, several deliveries of sand and stone were to private entities, such as various railroads.
C. Damages
With respect to the hauling of bituminous concrete to public construction projects, the plaintiffs have established their entitlement to prevailing wages. The trip logs for each plaintiff has been submitted as agreed exhibits. (See Stipulation and exhibits 1-11.)[13] There does not appear to be any contest over whether the asphalt deliveries made to the sites listed in these exhibits were qualifying public works jobs, with the exception of deliveries made by Tobieson to railroad facilities on three dates and to a BJ’s Wholesale Club on another date, all of which the court excludes from the damages. (See defendant’s request for findings of fact, ¶¶36, 61 and 88-89.) Nor does the defendant appear to contest the accuracy of the amount of time entered by each plaintiff recorded on the trip logs and upon which they claim to have spent on each qualifying delivery. Therefore, from an examination of the drivers trip logs, the actual time logged by the plaintiff Rick Favreau on 54 asphalt deliveries for which he claims a prevailing wage is due is 170 hours, and with one trip of 3.1 hours additionally supplied by his average time per trip, for a total time of 173.1 hours. For Barry Cox, actual time logged on 9 deliveries totals 34.5 hours, with time entries undeterminable for the 7 trips made on August 28, and October 3, 1996, and April 29, 1997. When the average trip time is supplied for these loads, an additional 26.81 hours results, for a total time of 61.31 hours for 16 deliveries. Actual time logged by Eric Tobieson on 94 qualified asphalt *701 runs totals 247.75 hours, and the time spent on the 11 loads of October 21-22, 1996, and July 10-11, 1997, unaccounted for. When Tobieson’s average run time of 2.63 hours is supplied, additional time is found of 28.93 hours, for a total time of 276.68 hours.
While the total trip time can thus be determined, there is no direct evidence from any source specific to the question of what portion of the time the truck spent while it was empty. It would be overly simplistic an exercise and unfair to simply reduce the “portal-to-portal” time by a factor of 50%, since the truck will likely have spent more time hauling and then waiting at the site for contact with the paver or grinder, as well as the time that these road-site construction activities actually required, than the time spent when the truck was empty. Given the number of 176 qualifying trips and the total time spent of the three plaintiffs of 508 hours on those trips, the average time per trip is 2.88 hours. It is reasonable to infer, given the vagaries of the pick-up of the asphalt, distance hauling a full truck, time spent at the construction site waiting for interaction with the paver or grinder and the actual construction time, that the time spent hauling and on the job site would be, on average, approximately twice the amount of time than when the truck is being driven empty. Thus, it is reasonable to reduce the damages due the plaintiffs by 1 hour per trip. This results in a total of time due Cox of 61.31 hours for 16 deliveries being reduced by 16 hours, for a net result of 45.31 hours. For Eric Tobieson, his total time of 276.68 hours must be reduced by 105 hours, for a net time due of 171.68. For Rick Favreau, his total time of 173.1 hours must be reduced one hour for each of his 55 deliveries, resulting in a net amount of time due of 118.1 hours.
The evidence indicates that the plaintiffs were each paid $14.00 per hour when not earning prevailing wage rates, and that the prevailing wage rate for the time in question is $27.00 per hour, resulting in a claimed difference of $13.00 per hour, plus benefits due each in the amount of $12.00 per hour.[14] When the wage rate differential and the value of fringe benefits is applied to the time due each plaintiff damages result as follows:
A. For wages: Tobieson, $2,231.84; Cox, $589.03; and Favreau, $1,535.30;
B. For benefits: Tobieson, $2,060.16; Cox, $543.72; and Favreau, $1,417.20;
C. Totals: Tobieson, $4,292.00; Cox, $1,132.75; and Favreau, $2,952.50.

D.Treble Damages and Attorneys Fees

The plaintiffs also claim triple damages under the provisions of G.L.c. 149, §27, which states in relevant part as follows: “[a]ny employee claiming to be aggrieved by a violation of this section may . . . institute and prosecute ... a civil action for . . . any damages incurred, including treble damages for any loss of wages and other benefits. Any employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorneys fees.”
Neither this statute nor any decisional law interpreting it has provided any structure or guidelines for the imposition of treble damages. However, the purpose of this portion of the statute being so clearly punitive in nature, the court must examine the circumstances to determine whether there is any evidence of an intentional, knowing or wilful violation, in order to justify such a punishment. Such an examination is consistent with a recent interpretation of another section of the same chapter with identical language allowing for, but not requiring treble damages: G.L.c. 149, §150. In the case of Wiedmann v. Bradford Group, Inc., 444 Mass. 698 (2005), the court looked to a case that involved a claim for treble damages under the provisions of G.L.c. 151, §1B, which held that “treble damages are punitive in nature, allowed only where authorized by statute, and appropriate where conduct is ‘outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others.’ ” Goodrow v. Lane Bryant, Inc., 432 Mass. 165, 178 (2000).
There is no evidence suggestive that the defendant, by its general manager Joseph Howard, knowingly and wilfully disregarded the rights of the plaintiffs to prevailing wages for these jobs. On the contrary, the weight of the evidence suggests that there was, and is a great deal of uncertainty concerning the application of the prevailing wage law to the projects on which the plaintiffs were assigned and/or that it covered the work of the plaintiffs. The defendant’s general manager testified that he was unaware at any time relevant to the assignment of his employees to these projects that they were prevailing wage jobs and that none of these projects required him to submit such records for any project upon which the plaintiffs claim rely. Moreover, he testified credibly, that he would have known prior to assigning any employee to such a project, as it would have been advertised as. such, to allow.suppliers and contractors to factor into their bids the higher wages. Indeed, neither party sought to introduce any evidence from any public entity as to whether the jobs were advertised as prevailing wage jobs, nor that “certified” time records were required to be sent to any contractor or public body. Given such uncertainty, the apparent dependence of the defendant upon its customers to inform it of the application of the prevailing wage law and the lack of any evidence that the defendant knew that the work of his employees were subject to the prevailing wage law, Í do not find such conduct “outrageous,” nor recklessly indifferent to the rights of the plaintiffs. Therefore, treble damages are not warranted.
Attorneys fees are a different matter, however, as the statute is mandatory if the employee “prevails.” While the plaintiffs have “prevailed” in part, they have not submitted any evidence of attorneys fees. Therefore, *702 leave shall be granted for submission to the court, with service of a copy to opposing counsel, within 21 days of the entry of this decision, of a sworn, itemized invoice of services rendered and the legal fees and costs of suit incurred thereon by the plaintiffs; furthermore, leave is permitted for an additional 21-day period of time during which the defendant may examine such submission and file its opposition thereto, if any.

ORDER FOR JUDGMENT

For the foregoing reasons, a judgment shall enter for the plaintiffs in the amounts as follows, together with interest:
a. for the plaintiff Eric Tobieson, $4,292.00;
b. for the plaintiff Barry Cox, $1,132.75; and,
c. for the plaintiff Rick Favreau, $2,952.50.
Following further proceedings, a supplemental judgment shall enter for attorneys fees and costs.

The original complaint was in five counts, alleging: violation of the prevailing wage law (count I), violation of G.L.c. 93A (II), personal liability of Joseph Howard (III), public policy violations regarding non-reporting of oil spills (IV), and personal liability of Donna Howard. After summary judgment the sole remaining claim is that against T.S. Truck Services, Inc., which alleges violation of the prevailing wage law.

The parties appeared to use “asphalt” and “bituminous concrete” interchangeably. Whether these terms have distinctive meanings or not, they are used interchangeably herein. See Construction Industries of Massachusetts v. Commissioner of Labor and Industries, 406 Mass. 162, 163-64(1989), for a discussion of how bituminous concrete is made. Although bituminous concrete paving material may contain gravel, it is not considered to be either gravel or fill.

While the evidentiary record was not favored with any documentation from any public entity or source regarding the actual prevailing wage rate (inclusive of benefits) that had been set by the commissioner for teamsters working in this time period, it did include references by at least two of the plaintiffs to amounts of $38.96 and $39.68, hourly payments that would be expected to be paid under prevailing wages inclusive of health and pension benefits, resulting in a net health and welfare benefit of approximately $12.00 in addition to the prevailing wage rate applicable'to teamsters of $27.00 per hour. This testimony was uncontradicted.

The defendant conceded during trial that for the actual time that a dump truck, operated by one of the plaintiffs, was in physical contact with a paving machine as it conducted this operation, a prevailing wage was due under the prevailing wage law. The plaintiffs claim that payment of prevailing wage is also due for time spent in addition to that while in physical contact with the paver, such as for “over-the-road” time in the delivery of bituminous concrete to the construction site and for the time at the site in queue waiting for its turn at the paver.

Per the specific claims of the plaintiffs, Tobieson is seeking the wage difference for 211.97 hours devoted to the pick-up or delivery of bituminous concrete, Cox: 52.83 hours, and Favreau: 180.85 hours. See Plaintiffs’ Request for Rulings of Law, ¶31-33. The court has found some differences between the amounts claimed and those shown in the evidence regarding the amount of time each plaintiff was involved in asphalt deliveries, however.

Per the plaintiffs’ specification of claim, Tobieson seeks the difference in pay for 44.34 hours of time spent on the hauling of contaminated soil, Cox: 3.75 hours and Favreau: 70.83 hours. Plaintiffs’ Requests for Rulings, id.

The plaintiffs’ claim the amount of time spent in the delivery of emulsion are as follows: Tobieson, 112.13 hours, Cox, 49.84 hours and Favreau, 9.03 hours.

The amount of time the plaintiffs contend was spent in such deliveries are: for Tobieson, 6.45 hours, Cox, 64.36 hours and Favreau, 63.11 hours.

 While the “Dengenis Policy” referenced in the Palmer Paving decision was not introduced, it appears from its discussion on page 3 that the commissioner, in 1993, determined that “over-the-road” time spent by asphalt and concrete drivers were subject to the payment of prevailing wages.

The court recognizes that such an interpretation goes beyond and is inconsistent with that of the commissioner in 2001, and may contribute to some of the “logistical difficulties” observed in the Palmer Paving decision, at 4. However, the court notes that the decision of the commissioner did not apply a 15-minute limit to the time that asphalt drivers would be paid prevailing wage, but grants, instead, that all of their time, on-site, would be covered. This court does not find any significant difference in bookkeeping difficulties between one interpretation and another, nor any difference in the concern that the assignment of some drivers to public construction sites and others to non-public sites will create friction between those drivers. This decision cutting off prevailing wages for time when the truck is empiy should eliminate concern about when to cut off prevailing wages or difficulties in having to track the travel between public and non-public construction sites. (See discussion on damages, Part C, 17-18, infra) As the Palmer Paving decision, made in 2001, has prospective application, it does not have impact on the case at bar, and as the decision of this court has application only to the controversy before it, it has no bearing upon the decision of the commissioner in Palmer Paving.

While the trip logs document, in most respects, the amount of time that the drivers spent on these assignments, they did not provide the time for each and every delivery of asphalt. For example, while the logs reflected time for all but on of the 29 dates on which Rick Favreau made a delivery of bituminous concrete to a road construction job. The court was unable to locate the actual entries for 3 of the 9 dates Barry Cox made such trips and for 4 of the 52 dates of Eric Tobieson’s asphalt trips. From the sizeable number of actual time entries made, however, the court is able to determine an average amount of time each plaintiff spent per each such delivery: for Tobieson, 2.63 hours, for Cox, 3.83 hours, and for Favreau, 3.1 hours. It is thus reasonable to supply such an average to the deliveries wherein actual time is not given.

See G.L.c. 149, §§26-27, regarding the inclusion of payments by employers to health, welfare and pension funds in the determination of the “prevailing rate.” As previously noted, neither party offered any direct evidence of the actual rate established by the commissioner. See fri. 5, supra